# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

MICHAEL HUGH KELLY,

                Plaintiff,

v.

CITY OF ST. PAUL; CITY OF
MINNEAPOLIS; OFFICER ERNSTER,
Badge #18600, in his individual capacity as
a St. Paul Police Officer; OFFICER "A", in
his or her individual capacity as a St. Paul
Police Officer; OFFICER "B", in his or her
individual capacity as a St. Paul Police
Officer; OFFICER "C", in his or her
individual capacity as a St. Paul Police
Officer; OFFICER "D", in his or her
individual capacity as a St. Paul Police
Officer; OFFICER "E', in his or her
individual capacity as a St. Paul Police
Officer; OFFICER LUCAS PETERSON,
Badge #5630, in his individual capacity as
a Minneapolis Police Officer; OFFICER
"G", in his or her individual capacity as a
Minneapolis Police Officer; OFFICER
"H", in his or her individual capacity as a
Minneapolis Police Officer; OFFICER "I",
in his or her individual capacity as a
Minneapolis Police Officer; and OFFICER
"J", in his or her individual capacity as a
Minneapolis Police Officer,

                Defendants.

Civil No. 09-461 (JRT/JSM)

**MEMORANDUM OPINION
AND ORDER**

Peter J. Nickitas, **PETER J. NICKITAS LAW OFFICE, LLC**, 431 South
Seventh Street, Suite 2446, P.O. Box 15221, Minneapolis, MN 55415-
0221; and Theodore D. Dooley, **TED DOOLEY LAW OFFICES, LLC**,
1595 Selby Avenue, Suite 100, Saint Paul, MN 55104, for plaintiff.

Jason M. Hiveley and Jon K. Iverson, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

This action arises out of the use of force on and arrest of plaintiff Michael Kelly during an anti-war protest that took place during the Republican National Convention ("RNC") in Saint Paul, Minnesota in September 2008. On February 26, 2009, Kelly brought this action under 42 U.S.C. § 1983 against defendants City of Minneapolis and City of St. Paul (collectively, the "municipal defendants"), and Officer Lucas Peterson, Officer Ernster, and Officers A-E and G-J (collectively, the "individual defendants") (collectively, "defendants"). Kelly alleges violations of his Fourth Amendment right to be free from excessive force and unreasonable seizure, and alleges violations of his First Amendment rights. Kelly also alleges concomitant Minnesota tort claims. On June 1, 2010, defendants filed a motion for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

An entity known as the "Anti-War Committee" obtained a permit to march on September 4, 2008, from the Minnesota state capitol grounds toward the Xcel Energy Center in Saint Paul, Minnesota, where the RNC was being held. (*See* Frazer Aff. Ex. A, Docket No. 26.) The Anti-War Committee obtained the permit to demonstrate and march in protest of the war in Iraq. (*See* Kelly Dep. 25:1-20, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) The permit allowed participants to begin assembling on the state capitol

grounds at 1:00 P.M., and allowed participants to march between the hours of 3:00 P.M. and 5:00 P.M. (Frazer Aff. Ex. A, Docket No. 26.)

Kelly, who was not a member of the Anti-War Committee, attended the event with approximately 1000 other people. (Kelly Dep. 32:18-20, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly arrived at the state capitol after 2:30 P.M. and planned to march with the group toward the Xcel Energy Center after the events at the state capitol concluded. (*Id.* 25:9-10, 26:15-23, 27:13-20.) Prior to the march, Kelly obtained a large green banner[1] supported by two plastic poles – approximately four feet tall and one inch in diameter – that had the message: "No Peace for the War-Makers! U.S. OUT OF IRAQ NOW! Protest 9/4 at the RNC in St. Paul[,] antiwarcommittee.org." (*Id.* 140:6 – 141:5; Nickitas Aff. Ex. 4, Docket No. 36.) During the assembly at the state capitol, officers observed protestors "with weapons on the grounds, caches of rocks piled up, and other criminal activity." (Frazer Aff. ¶ 16, Docket No. 26.)

By 5:00 P.M., the march had not commenced and officers from the Mobile Field Forces ("MFF") moved into position to prevent participants from marching after the permit expired. (Frazer Aff. ¶¶ 15, 17-18, Docket No. 26.) The crowd soon began moving off of the state capitol grounds to march toward the Xcel Energy Center. (Kelly Dep. 33:2-8, 35:17-19, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) At 5:07 P.M., police gave the crowd dispersal orders and directed the marchers to leave the area and

---

[1] Defendants assert that the banner was approximately 12 feet long by 4 feet wide. (*See* Iverson Aff. Ex. C, Docket No. 24.) Kelly asserts that the banner was either 10 or 12 feet long by 3 feet wide. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 6, Docket No. 35.)

move west. (Frazer Aff. ¶ 22, Docket No. 26.) The crowd instead moved south from the state capitol grounds toward Cedar Avenue, where vehicle traffic was present. (Kelly Dep. 35:20-22, 38:2-7, 41:12-14, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly moved toward the front of the crowd, carrying the banner with another individual, Deb Konechne. (*Id.* 39:7-23, 50:4-12.) The crowd encountered a police line as it moved toward Cedar Avenue and changed directions, marching toward John Ireland Boulevard along the state capitol grounds. (*Id.* 39:11-17, 42:11-22; Map, Iverson Aff. Ex. B, Docket No. 24.) The crowd again encountered a police line en route to John Ireland Boulevard and again changed directions, moving along 12th Street toward Cedar Avenue. (Kelly Dep. 43:5-12, 45:7-10, 49:23 – 50:3, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly remained near the front of the crowd, holding the banner. (*Id.* 45:14-16, 54:24 – 55:4.) The crowd encountered another police line when it reached the intersection of 12th Street and Cedar Avenue. (*Id.* 53:23-25.) Although defendants assert that police repeatedly gave the crowd dispersal orders – including when the crowd reached the intersection of 12th Street and Cedar Avenue, (*see, e.g.*, Jinda Aff. ¶ 4 & Ex. A, Docket No. 27) – Kelly testified that he did not hear those orders during the march, (*see, e.g.*, Kelly Dep. 47:11-24, 49:22 – 50:3, 55:21 – 56:2, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24).

Officer Lucas Peterson was part of the police line of horse-mounted officers, bicycle officers, and on-foot officers that formed at the intersection of 12th Street and Cedar Avenue. (Kelly Dep. 53:16 – 54:3, Iverson Aff. Ex. A, Docket No. 24; Peterson Dep. 21:9-13, Iverson Aff. Ex. D, Docket No. 24.) Officer Peterson was assigned to

Minneapolis Police Chemical Agent Response Team ("CART") Team 8. (Iverson Aff. Ex. C, Docket No. 24.) Officer Peterson observed protestors, including Kelly, holding up the green banner directly in front of the police line and police horses. (Iverson Aff. Ex. C, Docket No. 24.) Peterson stated that the "Anarchists were holding [the banner] up . . . in front of the horses. These anarchists began to use the sign to push and strike and make contact with the horses. This caused the horses to begin to lose control and it was my fear that the animals would hurt someone in the crowd or an Officer." (*Id.*; *see also* Peterson Dep. 87:12 – 88:2, Iverson Aff. Ex. D, Docket No. 24.) Kelly testified that he and Konechne were "a few feet" or "several feet" from the police horses.[2] (Kelly Dep. 62:22-23, 116:16-18, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly testified that he did not hear any orders to move the sign away from the horses and could not recall any reaction by the horses to the banner. (*Id.* 62:6-7, 62:24 – 63:1.)

Officer Erik Skog was mounted on a police horse in the police line, but was not positioned directly in front of the banner. (Skog Aff. ¶ 4, Docket No. 29.) Officer Skog observed "individuals . . . use the banner to push and make contact with the horses. The banner was over the horses' eyes and this was extremely dangerous because the horse could get spooked and harm his officer or other individuals." (*Id.*) Officer Skog overheard other officers order the individuals holding the banner to get the sign away from the horses, but the individuals did not comply with the orders. (*Id.*) One of the

_____

[2] Video shows that the banner was displayed in close proximity to the horses and appears to cover one horse's eyes, although the exact distance between the banner and the horses is not clear. ("Terrorizing Dissent" at 1:50:34 – 1:50:38, Nickitas Aff. Ex. 14, Docket No. 36.)

mounted horse officers directed an on-foot officer on the police line to take the banner from Kelly and Konechne. (Iverson Aff. Ex. C, Docket No. 24; Peterson Dep. 97:21 – 98:9, Iverson Aff. Ex. D, Docket No. 24.) One of Kelly's fellow marchers, Stef Yorek, stated that the officer jumped out of the police line without warning or provocation. (Yorek Decl. ¶¶ 20-23, Nickitas Aff. Ex. 8, Docket No. 36.)

Many of the events that followed were caught on video. (*See generally* KSTP Video, Iverson Aff. Ex. E, Docket No. 24.[3]) When the on-foot officer attempted to take the banner, Kelly and Konechne began to use their body weight to pull back on the banner. (Iverson Aff. Ex. C, Docket No. 24; KSTP Video at 2:45 – 2:48, Iverson Aff. Ex. E, Docket No. 24.) Officer Peterson believed that in the "tug of war situation . . . . [i]t appeared as if others were helping [Kelly] and that the Officer was going to be drug into the hostile crowd." (Iverson Aff. Ex. C, Docket No. 24; Peterson Dep. 98:10-16, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24.) Kelly testified that he was several feet from the horses, did not assault the horse, did not assault an officer, and did not try to pull the officer who was tearing the banner away. (Kelly Dep. 143:1 -145:1, Iverson Aff. Ex. A, Docket No. 24.)

---

[3] Kelly submitted a video entitled "Terrorizing Dissent," which comprises over two hours of footage from the assembly, march, and protest, including video from the relevant incidents. (*See generally* "Terrorizing Dissent," Nickitas Aff. Ex. 14, Docket No. 36.) The relevant portions of "Terrorizing Dissent" contain significant editing. Among the edits are the removal of footage where Kelly appears to lunge toward the police line (after the on-foot officer removes the banner but before Officer Peterson fired the less-than-lethal marking round); and the inclusion of spliced video immediately after the marking round strikes Kelly showing another officer – not Officer Peterson – from a different division and at another time during the march aiming the marking-round firearm at the crowd.

The on-foot officer removed the banner from Kelly and Konechne, and video of the incident appears to show Kelly subsequently lunging forward with the plastic pole. (KSTP Video at 2:43, Iverson Aff. Ex. E, Docket No. 24.) Officer Peterson believed that Kelly was attempting to hit the officer with the pole. (Peterson Dep. 98:17-21, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24; *see also* KSTP Video at 2:47 – 2:48, Iverson Aff. Ex. E, Docket No. 24.) Yorek stated that Kelly made "no attempt to assault anyone." (Yorek Decl. ¶¶ 20-23, Nickitas Aff. Ex. 8, Docket No. 36.)

To "prevent the police officer from being assaulted," Officer Peterson immediately discharged a 40-millimeter less-than-lethal "marking round" directed at Kelly's midsection, striking Kelly in the "lower torso." (Iverson Aff. Ex. C, Docket No. 24; Peterson Dep. 99:6-20, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24; *see also* KSTP Video at 2:48, Iverson Aff. Ex. E, Docket No. 24.) The 40-millimeter marking round is similar to a foam baton or sponge round. (Peterson Dep. 22:17-24, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24; Training Materials at MPD-005 & MPD-014, Iverson Aff. Ex. G, Docket No. 24.) The use of a marking round is considered equal to or "a little above" the use of an ASP baton or impact weapon on the use-of-force continuum and is considered a lower level of force than use of a conventional firearm and ammunition. (Peterson Dep. 49:2-9; 50:11-19, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24.) Peterson testified that the velocity of a marking round is roughly similar to that of a "professionally-thrown baseball." (*Id.* 23:9-12.) Police use marking rounds to incapacitate "an aggressive, noncompliant subject," and the marking round leaves a green powder residue on the individual that it strikes, which allows officers to identify the

individual for arrest. (*Id.* 21:21-24, 22:10-14, 53:5-16.) Officers were authorized to deploy the marking round in response to any "Felonious Act," any assault, or any gross misdemeanor or felony property damage. (Training Materials at MPD-030, Iverson Aff. Ex. G, Docket No. 24.)

Peterson testified that after firing the less-than-lethal marking round, "[Kelly] went down. And [the shot] prevented his assault and his advance." (Peterson Dep. 99:23-24, Jan. 18, 2010, Iverson Aff. Ex. D, Docket No. 24.) Peterson testified that the crowd then "dragged [Kelly] away into the crowd, preventing officers from going in and arresting him." (*Id.* 100:1-4.) Kelly continued to protest with the crowd for the following hour until law enforcement arrested him and other protesters for being present at an unlawful assembly. (Kelly Dep. 75:2-19, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24; Iverson Aff. Ex. C, Docket No. 24; Nybeck Aff. Exs. A, B, Docket No. 28.)

Law enforcement arrested the protestors when they failed to disperse after police gave multiple dispersal orders. (Jindra Aff. ¶¶ 7, 9, Docket No. 27.) Bloomington Police Officer Matthew Nybeck placed Kelly in plastic flexcuffs and took him to a holding facility at the police station. (Kelly Dep. 77:8-20, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24; Nybeck Aff. Exs. A, B, Docket No. 28.) Police cited Kelly with misdemeanor presence at an unlawful assembly, in violation of Minn. Stat. § 609.715, and released him just under six hours after he was taken into custody. (Kelly Dep. 76:7-9, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24; Nybeck Aff. Ex. B, Docket No. 28.) Officer Ernster issued the citation to Kelly. (Nybeck Aff. Ex. B, Docket No. 28.) The

charge was later dismissed. (Kelly Dep. 144:21 – 145:12, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.)

The marking round strike left Kelly with a large red and purple welt on the left side of his lower torso. (Yorek Decl. ¶¶ 58-59, Nickitas Aff. Ex. 8, Docket No. 36.) Kelly called in sick to work for two days and lost a total of sixteen hours of work, although he was paid for those two days. (Kelly Dep. 127:5-19, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly stated that the pain and bruising from the injury lasted a number of months, during which he found it difficult to lift heavy things or turn his body around. (*Id.* 154:20 – 155:5.) Approximately one week after the incident, Kelly saw an urgent care doctor and underwent an ultrasound to determine if he had any internal injuries. (*Id.* 153:4 – 154:3.) The ultrasound indicated no internal damage, and Kelly made a ten-dollar co-pay for that visit. (*Id.* 154:4-12.)

On February 26, 2009, Kelly filed this action against defendants. (Compl., Docket No. 1.) On October 23, 2009, Kelly filed an amended complaint naming as defendants the City of St. Paul, the City of Minneapolis, Officer Ernster in his individual capacity as a St. Paul Police Officer; Officer Peterson in his individual capacity as a Minneapolis Police Officer; Officers "A" through "E" in their individual capacities as St. Paul Police Officers; and Officers "G" through "J" in their individual capacities as Minneapolis Police Officers. (Am. Compl., Docket No. 14.) Kelly alleges two claims under 42 U.S.C. § 1983. First, Kelly alleges that the individual officers violated Kelly's "clearly established [Fourth Amendment] right to be free from infliction of excessive, unreasonable force and unreasonable seizure of his person and his personal property."

(*Id.* ¶ 82.)  Second, Kelly alleges that the individual officers violated Kelly's First Amendment rights by retaliating against him for participating in the march and exercising his right to free speech.  (*See id.* ¶ 93.)  Kelly also alleges concomitant Minnesota common law claims against the individual defendants and against the municipal defendants under the doctrine of respondeat superior for battery, (*id.* ¶¶ 83-91), false imprisonment (*id.* ¶¶ 95-103), and conversion of the banner, (*id.* ¶¶ 104-12); and a common law claim for negligence against the City of Minneapolis, (*id.* ¶¶ 113-15).  On June 1, 2010, defendants filed a motion for summary judgment.

## DISCUSSION

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    KELLY'S § 1983 CLAIMS AND QUALIFIED IMMUNITY

Kelly asserts constitutional claims against Officer Peterson, Officer Ernster, nine unnamed St. Paul Police and Minneapolis Police Officers ("Officers "A" through "E" and Officers "G" through "J") for excessive force and unreasonable seizure of Kelly's person in violation of Kelly's Fourth and Fourteenth Amendment rights, and retaliation in violation of Kelly's First and Fourteenth Amendment rights. Defendants argue that the individual officers are entitled to qualified immunity because the undisputed facts do not support the allegations that the officers violated Kelly's constitutional rights or that those rights were clearly established.

The doctrine of qualified immunity protects state actors from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (emphasis omitted), *receded from in Pearson*, 129 S. Ct. at 818. Qualified immunity is a question of law and courts seek to "resolv[e] immunity questions at the earliest possible stage in the litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

"To overcome the defense of qualified immunity the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the

deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (internal quotation marks omitted). The Supreme Court recently held that the Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson*, 129 S. Ct. at 818.

## A.     Fourth Amendment Rights

Kelly alleges claims for excessive force and unreasonable seizure based on his arrest for being present at an unlawful assembly.

### 1.     Excessive Force

Defendants argue that Officer Peterson did not use excessive force against Kelly when he fired a marking round at and struck Kelly.

#### a.     Clearly Established Constitutional Right

Defendants argue that "Officer Peterson is entitled to the protection of qualified immunity because it was not clearly established a reasonable officer could not use force to prevent an assault on another officer in similar circumstances." (Defs.' Mem. in Supp. of Mot. for Summ. J. at 15, Docket No. 31.) Defendants incorporate the unique and disputed facts in this case and assume that Officer Peterson was protecting another officer. Defendants thus characterize the constitutional right too narrowly. The Court concludes that the constitutional right at issue is the broader right to be free from unreasonable seizures or excessive force, and "[t]he right to be free from excessive force

is clearly established under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Maeberry v. City of St. Paul*, Civ. No. 09-1216, 2010 WL 2814285, at *5 (D. Minn. July 16, 2010) (citing *Graham*, 490 U.S. at 394-95).

Because there is a clearly established constitutional right, the Court turns to whether Officer Peterson violated Kelly's right to be free from excessive force.

### b.     Violation of Constitutional Right

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Cook v. City of Bella Villa*, 582 F.3d 840, 848-49 (8th Cir. 2009) (internal quotation marks and brackets omitted). "Excessive force claims arise under the Fourth Amendment." *Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009). "Not every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (alteration in original) (internal quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding that excessive force claims are analyzed under an "objective reasonableness" standard). The Court does not consider the officer's "underlying intent or motivation." *Graham*, 490 U.S. at 397. The Court considers the totality of the circumstances to assess the reasonableness of the officer's conduct, and the Supreme Court in *Graham v. Connor* identified three factors relevant to that assessment: "[(1)] the severity of the crime at

issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The Court does not evaluate reasonableness "with the 20/20 vision of hindsight. This calculus allows for the fact that police officers are often forced to make split-second decisions – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations and internal quotation marks omitted).

The Court must conduct a "fact-intensive inquiry in light of the specific context of the case to determine whether [an officer] is entitled to qualified immunity." *Rohrbough*, 586 F.3d at 587 (internal quotation marks omitted). "The dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 586 (internal quotation marks omitted). Qualified immunity will "shield all but the plainly incompetent or those who knowingly violate the law." *Littrel v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (internal quotation marks omitted).

Kelly has adduced sufficient evidence to defeat defendants' motion for summary judgment on the excessive force claim. Viewing the facts in a light most favorable to Kelly, a reasonable trier of fact could conclude that Officer Peterson acted objectively unreasonably in discharging the marking round. Kelly testified that at the time of the stalemate with the police line at the intersection of 12th Street and Cedar Avenue, he was "a few feet" or "several feet" away from the police horses while holding the banner. (Kelly Dep. 116:16-18, 60:19-24, 61:18-22, 62:22-23, Jan. 19, 2010, Iverson Aff. Ex. A,

Docket No. 24.) Kelly and Yorek assert that they did not hear dispersal warnings from police officers. (Yorek Decl. ¶¶ 21-23, 28, Nickitas Aff. Ex. 8, Docket No. 36; Kelly Dep. 62:6-7, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly could not recall any specific reaction by the horses to the banner or any reaction from the police officers. (Kelly Dep. 62:24 – 63:6, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) Kelly testified that the on-foot police officer surprised him when he took the banner from Kelly. (*Id.* 64:5-11.) Yorek states that the crowd was protesting peacefully without cursing or threatening the officers, that Kelly did not make contact with horses or police officers with the banner, and that the on-foot officer grabbed the banner from Kelly without warning or provocation. (Yorek Decl. ¶¶ 13-16, 21-23, Nickitas Aff. Ex. 8, Docket No. 36.) Kelly testified that he did not make any act to assault a police officer or a police horse, that he did not try to pull the on-foot officer into the crowd, and that the crowd did not attempt to swarm the officer who pulled down the banner. (Kelly Dep. 143:10 – 144:6, 144:14-20, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24; *see also* Yorek Decl. ¶ 18, Nickitas Aff. Ex. 8, Docket No. 36.)

The video recording from KSTP and the events recorded in "Terrorizing Dissent" cast some doubt on Kelly's and defendants' versions of events and the circumstances leading up to Officer Peterson's use of force. In particular, the video suggests that Kelly was closer to the police horses and the police line than "several feet" away. The video also indicates that Kelly and Konechne were holding the banner very close to some of the police horses. Further, the video shows Kelly and Konechne pull the banner back when the on-foot police officer attempted to remove the banner from the crowd. Finally, and

significantly, the KSTP video appears to show that after the police officer wrested the banner from Kelly and Konechne, Kelly lunged forward toward the police line with the plastic pole that formerly held the banner upright.[4]  (KSTP Video at 2:46 – 2:48, Iverson Aff. Ex. E, Docket No. 24.)  The KSTP video shows that Kelly is shot as he moves or lunges forward.  (*Id.* at 2:47.)

The video footage, however, is not dispositive to the summary judgment motion. The videos are shot from angles that make it difficult to determine how far away Kelly is from the police horses.  Further, the video footage suggests, but does not conclusively show, that Kelly lunges forward in an aggressive motion.  In examining whether a police officer used excessive force, the Court considers whether Officer Peterson used objectively unreasonable force in the situation with which he was confronted.  *See Rohrbough*, 586 F.3d at 586.  Despite the video footage, a fact dispute remains regarding whether Officer Peterson used unlawful or excessive force given the circumstances of which he was aware.  *See Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994) ("[T]he qualified immunity question requires [the Court] to assess the facts as they appeared to the officers.").  Although the Court views this as a relatively close decision, a reasonable trier of fact could find in Kelly's favor if he or she credited Kelly's version of events or determined that regardless, Peterson's use of a marking round constituted excessive force in violation of Kelly's Fourth Amendment rights.  Accordingly, the Court

---

[4] This portion of events is edited from the footage in "Terrorizing Dissent."  ("Terrorizing Dissent" at 1:51:23, Nickitas Aff. Ex. 14, Docket No. 36.)

denies defendants' motion for summary judgment on excessive force and qualified immunity.

## 2.    Arguable Probable Cause to Arrest

Defendants argue that they are entitled to summary judgment on Kelly's claim for unreasonable seizure or arrest because the officers had arguable probable cause to arrest Kelly for being present at an unlawful assembly in violation of Minn. Stat. § 609.715.

"It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (per curiam). "Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim is not probable cause in fact but arguable probable cause[.]" *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (internal quotation marks omitted); *see also Baribeau*, 596 F.3d at 478. "Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). "Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (citation omitted). "If an officer has probable cause to believe that an individual has committed even a very

minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Under Minnesota statute,

When three or more persons assemble, each participant is guilty of unlawful assembly, which is a misdemeanor, if the assembly is . . . with intent to commit any unlawful act by force; . . . with intent to carry out any purpose in such manner as will disturb or threaten the public peace; or . . . without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace."

Minn. Stat. § 609.705. "Whoever without lawful purpose is present at the place of an unlawful assembly and refuses to leave when so directed by a law enforcement officer is guilty of a misdemeanor." *Id.* § 609.715.

Kelly does not dispute that he assembled with others at the intersection of 12th Street and Cedar Avenue, despite the fact that the permit allowing protestors to march had expired. Kelly admitted that he continued to protest even after Officer Peterson fired a marking round at Kelly. Although there may be a dispute of fact whether Kelly heard the police dispersal orders, the issue before the Court is whether the police officers had arguable probable cause to arrest Kelly for being present at an unlawful assembly in violation of Minnesota Statute § 609.715. The undisputed facts support an arguable probable cause finding and a reasonable trier of fact could not conclude that the individual officers lacked arguable probable cause to arrest Kelly. The Court grants defendants' motion for summary judgment on qualified immunity on this claim.

## B.     First Amendment Rights

Kelly alleges that defendants violated his First Amendment right to free speech by retaliating against him for exercising his free speech rights.  (*See* Am. Compl. ¶ 93 ("[The individual officers] violated [Kelly's] clearly established right to freedom of peaceful speech on a public street under the First and Fourteenth Amendments to the United States Constitution[.]").)   Defendants argue that Kelly's speech was not entitled to First Amendment protections because he was validly arrested and, in the alternative, because Kelly has adduced no evidence that the individual officers' actions were motivated by Kelly's exercise of First Amendment-protected activity.

"A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established."  *Baribeau*, 596 F.3d at 481 (internal quotation marks omitted).  Thus, the Court turns to whether the individual defendants violated Kelly's First Amendment-protected rights during Kelly's march and protest.

It is unclear whether Kelly's First Amendment claim challenges his arrest for unlawful assembly or challenges Officer Peterson's deployment of a marking round at Kelly.  Under either theory, Kelly's First Amendment claim fails as a matter of law.

"When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested."  *See Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998).  The undisputed facts support a finding of arguable probable cause, and the officers therefore lawfully arrested Kelly for being present at an unlawful assembly.  The individual officers are entitled to qualified immunity under that theory.

To the extent that Kelly alleges that Officer Peterson's firing of a marking round at Kelly violated Kelly's First Amendment rights, Kelly has not adduced evidence that Kelly's protected speech motivated Officer Peterson's actions. To establish a claim under § 1983 for retaliation in violation of the First Amendment, Kelly "must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). "In brief, [Kelly] must show the [individual officers] took the adverse action because [Kelly] engaged in the protected speech." *See id.* "Retaliation need not have been the sole motive, but it must have been a substantial factor[.]" *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (internal quotation marks omitted). "Furthermore, the plaintiff must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was singled out for adverse treatment because of his exercise of constitutional rights." *Id.* (internal quotation marks omitted). "The causal connection [between the protected speech and the adverse action] is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Revels*, 382 F.3d at 876 (internal quotation marks omitted).

Kelly has not adduced any evidence showing that Officer Peterson's use of force was motivated by Kelly's exercise of First Amendment-protected rights. Rather, the undisputed evidence demonstrates that Officer Peterson's use of force was motivated

solely by Kelly's alleged conduct toward police. Accordingly, the Court grants defendants' motion for summary judgment on qualified immunity as to this claim.

## III.   MINNESOTA TORT CLAIMS

Kelly brings state tort claims based on the factual allegations underlying his federal § 1983 claims for excessive force and unlawful arrest. Kelly also brings a claim for conversion of the banner and a negligence claim against the City of Minneapolis.

### A.   Battery

Kelly alleges a battery claim based on Officer Peterson's use of force against Kelly. (Am. Compl. ¶ 84, Docket No. 14.) "A battery is . . . an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980). Under Minnesota law, police officers are authorized to use reasonable force "in effecting a lawful arrest" or "in the execution of legal process." Minn. Stat. § 609.06 subd. 1(1); *see also Paradise*, 297 N.W.2d at 155 ("[A] police officer is permitted to come in contact with an individual in the course of arresting and detaining him to the extent it is 'necessary' to effectuate such arrest and detention."). "[O]nly the use of **excessive** force by a police officer will constitute a battery." *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984). Thus, "to succeed on [his] claims against [Peterson], [Kelly] must establish that [Peterson] used an unreasonable amount of force against [him]." *Brown v. City of Golden Valley*, 534 F. Supp. 2d 984, 995 (D. Minn. 2008).

As noted above regarding Kelly's § 1983 claim for excessive force, there is a dispute of fact about whether Officer Peterson's use of force was excessive. Defendants argue that if the Court concludes that Kelly has established his state tort claims, Officer Peterson is entitled to official immunity and the municipal defendants are entitled to vicarious official immunity. The Court separately analyzes claims for qualified immunity under federal law and official immunity under Minnesota law. *Rico v. State*, 472 N.W.2d 100, 108 (Minn. 1991) ("Today we reiterate that official immunity, as a state common law doctrine, retains an existence distinct from qualified immunity."); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988) ("The common law of official immunity retains an independent vitality in state tort actions."). To determine whether a party is entitled to official immunity, the Court considers "(1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection." *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001).

The Court determines whether an act is discretionary or ministerial as a matter of law. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n.5 (Minn. 1999). "Some degree of judgment or discretion will not necessarily confer discretionary immunity on an official; the crucial focus is upon the nature of the act." *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn. 1988). "A public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Dokman*, 637 N.W.2d at

296 (internal quotation marks omitted).  Similar to federal decisions addressing qualified immunity in § 1983 claims, "the legal reasonableness of the official's actions is relevant to whether the public employee committed a wilful or malicious wrong under the doctrine of official immunity."  *Rico*, 472 N.W.2d at 108.

Kelly does not dispute that Officer Peterson's actions were discretionary.  Further, for the reasons discussed above regarding qualified immunity in the context of Kelly's excessive force claims, the defendants are not entitled to summary judgment on the issue of official immunity because there is a dispute of fact as to the reasonableness of Officer Peterson's use of force.  To the extent that the municipal defendants could be liable for Officer Peterson's actions, there is a dispute of fact about whether they are entitled to vicarious official immunity on the battery claims.  *See Watson v. Metro Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996); *Dokman*, 637 N.W.2d at 297.  As a consequence, the Court denies defendants motion for summary judgment on the issues of battery and official immunity.

## B.    False Imprisonment

Kelly alleges false imprisonment claims against the individual defendants and against the municipal defendants under the doctrine of respondeat superior.  To establish false imprisonment, a plaintiff must show "(1) an arrest performed by defendant, and (2) the unlawfulness of such arrest."  *Perkins v. St. Louis County*, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986) (internal quotation marks omitted).  Under Minnesota law, a peace officer may arrest a person "without a warrant . . . when a public offense has been

committed or attempted in the officer's presence."  Minn. Stat. § 629.34 subd.1(c)(1).

Those offenses "include both felonies and misdemeanors, even those which do not

amount to breaches of the peace."  *Smith v. Hubbard*, 91 N.W.2d 756, 761 (Minn. 1958).

If probable cause to arrest exists, the subsequent arrest is lawful and a plaintiff may not

maintain an action for false imprisonment.  *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn.

1990); *see also Perkins*, 397 N.W.2d at 408 ("If an arrest is made without proper legal

authority, it is a false arrest.  Subsequent restraint is false imprisonment.").

For the reasons discussed above relating to Kelly's § 1983 claim for unlawful

arrest, officers had arguable probable cause to believe that Kelly was present at an

unlawful assembly.  Accordingly, there is no dispute of fact that officers lawfully arrested

Kelly and Kelly may not maintain his false imprisonment claim.  The Court grants

defendants' motion to that extent.

## C.    Conversion

Kelly alleges common law conversion of the banner, claiming that defendants took

the banner from him and have not returned it.  (Am. Compl. ¶ 105, Docket No. 14.)

Conversion is "an act of willful interference with [the personal property of another],

done, without lawful justification, by which any person entitled thereto is deprived of use

and possession, and the exercise of dominion and control over goods inconsistent with,

and in repudiation of, the owner's rights in those goods."  *Christensen v. Milbank Ins.

Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (alteration in original) (citation and internal

quotation marks omitted).

Kelly testified that the banner was not his banner, (Kelly Dep. 133:14-25, 134:1-6, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24), that he did not make the banner or know who made it, (*id.* 38:25 – 39:3), and that he did not bring the sign to the event, (*id.* 39:4-6). Thus, Kelly has not established that he was entitled to the banner, and the Court grants defendants' motion for summary judgment as to this claim.

### D. Negligence

Kelly brings a negligence claim against the City of Minneapolis and its officers, alleging that the Minneapolis police officers "breached their legal duty to exercise ordinary care toward [Kelly's] person during the events giving rise to this lawsuit." (Am. Compl. ¶ 114, Docket No. 14.) To establish a claim for negligence, a plaintiff must show that a duty existed, the duty was breached, defendants' actions were the proximate cause of the breach, and the plaintiff was injured as a result. *Foss v. Kincade*, 766 N.W.2d 317, 320 (Minn. 2009). Whether a legal duty exists is a question of law for the Court. *State v. Back*, 775 N.W.2d 866, 869 (Minn. 2009). A general duty "owed to the entire public rather than a specific class of persons cannot form the basis of a negligence action." *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 804 (Minn. 1979). To recover against a municipality for negligence, a plaintiff "must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public." *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 199 N.W.2d 158, 160 (Minn. 1972). To establish respondeat superior, the state actor must be personally liable

for the tort and the actor must be acting within the scope of employment by his employer. *Leaon v. Washington County*, 397 N.W.2d 867, 874 (Minn. 1986).

Kelly has not alleged, argued, or adduced any evidence that the City of Minneapolis owed Kelly a duty of care or that Officer Peterson's use of force breached that duty of care. The Court grants defendants' motion for summary judgment on this claim.

## IV. OFFICERS "A" THROUGH "E," "G" THROUGH "J," and OFFICER ERNSTER

Kelly has not adduced evidence supporting any claim against Officers A-E, Officers G-J, or Officer Ernster. The undisputed facts show that Officer Ernster did not arrest Kelly, and Officer Ernster could not be liable for unreasonable seizure or unlawful arrest given the record before the Court. Kelly offers no evidence that Officer Ernster or the unidentified officers were otherwise liable. (*See* Kelly Dep. 129:16-23, 132:5-25, 133:1-2, Jan. 19, 2010, Iverson Aff. Ex. A, Docket No. 24.) The Court grants defendants' motion for summary judgment as to Officer Ernster and the unnamed officers listed in the amended complaint.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Docket No. 22] is **GRANTED in part** and **DENIED in part** as follows:

1.    The motion is **GRANTED** as to Officer "A", Officer "B", Officer "C", Officer "D", Officer "E", Officer "G", Officer "H", Officer "I", Officer "J", and Officer Ernster.  Those defendants are **DISMISSED** from the case.

2.    The motion is **GRANTED** as to Claim I, to the extent that claim alleges unlawful arrest in violation of the Fourth Amendment under 42 U.S.C. § 1983; Claim III because Officer Peterson is not employed by the City of St. Paul; Claim V (¶ 92-94) for violation of plaintiff's First Amendment rights under 42 U.S.C. § 1983; Claims V (¶ 95-97), VI, and VII for common law false imprisonment; Claims VIII, IX, and X for common law conversion; and Claim XI for common law negligence.  Those claims are **DISMISSED**.

3.    The motion is **DENIED** as to Claim I, to the extent that claim alleges excessive force against Officer Peterson in violation of the Fourth Amendment under 42 U.S.C. § 1983; and Claims II and IV for common law battery against Officer Peterson and against the City of Minneapolis under the doctrine of respondeat superior.

DATED:  October 18, 2010                          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                      United States District Judge